UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                             :

UNITED STATES OF AMERICA              :

                                              :

- v -                                     :

                                              :     22 Cr. 178 (NSR)

                                              :

DAVID ZAYAS,                        :

                                              :

                        Defendant.      :

                                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPRESS


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
300 Quarropas St.
White Plains, New York 10601

T. Josiah Pertz
Assistant United States Attorney
*Of Counsel*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................. **1**

**BACKGROUND** ................................................................................................... **1**
A.    The WCPD Narcotics Investigation ............................................................ 1
B.    The March 10, 2022 Car Stop ..................................................................... 3
C.    Procedural History ....................................................................................... 6

**ARGUMENT** ...................................................................................................... **6**

**I.   Officer DiRienzo Had Reasonable Suspicion For The Stop** ............................. **8**
A.    Applicable Law ............................................................................................ 8
B.    Discussion .................................................................................................... 9
     1.  WCPD Officers Had Reasonable Suspicion that Zayas Was Engaged in Narcotics Trafficking ............................................................................... 9
     2.  The WCPD Had Reasonable Suspicion that Zayas Had Committed a Traffic Offense .......................................................................................... 13

**II.  Officers Reasonably Extended the Stop to Investigate Narcotics Trafficking** ............... **14**

**III.  The Subject Devices Warrant Is Valid** ........................................................... **16**

**IV.  No Hearing Is Required** ................................................................................. **23**

**CONCLUSION** .................................................................................................. **25**

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant David Zayas's motion to suppress the crack cocaine, handguns, ammunition, cash and digital evidence recovered from his car by the Westchester County Department of Public Safety ("WCPD"). In his motion, the defendant argues that WCPD acted unlawfully in stopping his vehicle, extending the stop to conduct a narcotics investigation, and searching his cellphones. As explained below, the WCPD's stop of the defendant's vehicle, the subsequent search of a hidden compartment in the vehicle, and the search of the defendant's phones pursuant to a warrant, were supported by the Fourth Amendment. The Government respectfully submits that the defendant's motion should be denied without a hearing.

## BACKGROUND[1]

### A. The WCPD Narcotics Investigation

WCPD has been conducting a long-term investigation of narcotics traffickers who use the highways of Westchester County to transport drugs from New York City to New England. As part of the investigation, Sgt. Kyle McCarrick of WCPD's Intelligence Unit and Real Time Crime Center ("RTC") identifies subject vehicles through, among other means, analysis of license plate reader ("LPR") data and criminal history reports on vehicle owners. RTC then relays the information to WCPD officers who patrol the highways, including WCPD's Conditions Unit, which conducts interdiction.

---

[1] The facts in this section are drawn from the Complaint dated March 11, 2022, 22-mj-2323 (the "Complaint"), documents produced in discovery, and interviews with WCPD officers. Aside from his commission of a traffic offense, and the visibility of his destination address on his cellphone at the time officers first viewed it in his car, the defendant's affidavit does not dispute the material facts in this brief. The Government is enclosing a disc with each cited exhibit, which will be shared with defense counsel.

Among the vehicles identified as part of the investigation was a 2020 gray Chevrolet Equinox bearing a certain Massachusetts license plate (the "Gray Equinox"). The Gray Equinox exhibited traffic patterns consistent with narcotics trafficking. Between in or about August 2020 and March 2022, the Gray Equinox made at least nine trips from Massachusetts to the New York City area. Complete roundtrip data was not available for each trip, but at least some trips, including on or about October 16, 2020 and August 21, 2021, involved a turnaround time of under one hour – that is, it was less than an hour from the time the vehicle was detected heading southbound to the time it was detected northbound. WCPD has determined, through training and experience, that narcotics traffickers often travel large distances to conduct a transaction and then return quickly to their origin city. According to service history records, the Gray Equinox averaged approximately 30,000 miles per year – more than double the average for personal cars driven in the United States. WCPD has also determined, through training and experience, that vehicles used to transport drugs often have above-average yearly mileage, because of their use to make long-distance trips to buy and sell narcotics. WCPD has learned that mid-tier SUVs, including the Equinox, are common choices for drug traffickers to outfit with hidden compartments, as such vehicles are affordable and designed with natural voids that can be used to construct the compartments.

WCPD had learned, prior to stopping the Gray Equinox, that it was owned by David Zayas, who had a prior felony conviction for drug trafficking, as well as prior arrests for drug trafficking and assault and battery with a weapon. Prior to owning the Equinox, Zayas had owned a Ford Edge, which Zayas sold to another individual ("Individual-1") who had multiple prior convictions for narcotics offenses. Individual-1 had been the registered owner of a

different particular car before the City of Worcester Police Department took ownership of that vehicle.

### B.  The March 10, 2022 Car Stop

On the afternoon of March 10, 2022, WCPD Officer DiRienzo was patrolling the Cross County Parkway in Yonkers, New York in an unmarked police vehicle. At approximately 2:42 p.m., RTC alerted Officer DiRienzo that the Gray Equinox was traveling southbound on the Hutchinson River Parkway in Scarsdale, and that the Gray Equinox had previously been identified as a subject vehicle in a narcotics trafficking investigation.

At approximately 2:48 p.m., Officer DiRienzo observed the Gray Equinox illegally change lanes twice without signaling.  Officer DiRienzo followed the Gray Equinox and observed it travelling approximately 15-20 miles per hour faster than the speed limit. Officer DiRienzo signaled for the vehicle to pull over, which it did.

Officer DiRienzo activated his body-worn camera. (Footage attached as Exhibit 1.) Officer DiRienzo walked up to the Gray Equinox and asked the driver for his license and registration, which identified the driver as David Zayas. At Officer DiRienzo's request, Zayas stepped out of the car and spoke to Officer DiRienzo on the side of the highway. When asked where he was headed, Zayas responded, "I'm going to see my aunt in the hospital," and when asked which hospital, he hesitated and said, "Uhhhhhh Lincoln Hospital. Lincoln, yup." (Ex. 1, 2:42.)[2] When the officer asked, "Where's Lincoln Hospital? That's not in Yonkers, right?",

---

[2] At Zayas's initial appearance on the Complaint before Judge Krause on March 11, 2022, defense counsel, with Zayas seated next to him, stated that the defendant's aunt was at Bronx Lebanon Hospital.  (Def. Ex. C, Tr. 22:1-2.)  In the defendant's affidavit, he returns to the claim he made on the highway that he was traveling to visit his aunt at Lincoln Hospital. (Def. Ex. A. ¶ 3.) Lincoln Hospital is approximately two miles south of Bronx-Lebanon Hospital, and the two are unaffiliated.

Zayas looked down, shook his head, thought about it for several seconds, and said "Uhhh. I believe so, I'm not really sure, uhh," then thought about it further and said, "Definitely in the Bronx," and nodded his head. (*Id.* 3:46.) He added, "I don't know exactly where. [*Sounds like: "check my"*] GPS." (*Id.* 3:57.)

Officer DiRienzo continued to question Zayas, and asked him if he was carrying drugs or guns in the car. Zayas denied this. While speaking with Zayas about his destination and purpose, Officer DiRienzo observed Zayas display indicia of nervousness, such as laughing nervously (Ex. 1, 2:32), licking his lips frequently and appearing to develop cottonmouth (*id.* 3:46; *see also* 12:31, 12:46, and attached screenshots from Ex. 1). Zayas was noticeably delayed in responding to some questions, provided vague answers, often avoided eye contact when answering, had a volume change when speaking about illegal items, and had shaking in his legs.

Based on this conduct, Officer DiRienzo suspected that Zayas was being deceptive about his reason for travel. From his experience as a law enforcement officer, Officer DiRienzo knew that parkways in Westchester County are a major corridor between the New England area and the New York City area for the trafficking of illegal narcotics, large amounts of U.S. currency from illegal narcotics sales, and weapons.

Officer DiRienzo was traveling with a trained police dog, Liberty, waiting in the police vehicle. Liberty has been with the WCPD since October 2020. Liberty completed a ten-week basic course of instruction in narcotics detection at the Westchester County Police Academy in Valhalla, New York. In July of 2021, Liberty and Officer DiRienzo were certified by New York State Division of Criminal Justice Services as a Police Narcotics Detection Canine Team for cocaine, crack cocaine, methamphetamines, MDMA, and heroin detection. Liberty positively alerts her handler to the presence of narcotic odors through pre-arranged signaling behavior.

4

Liberty is used regularly in narcotics detection and has participated in numerous seizures of narcotics and U.S. currency. Liberty has also been used for narcotics detection by other federal, state and local law enforcement agencies. Marijuana is not among the substances that Liberty was trained and certified to detect.

After questioning Zayas, Officer DiRienzo brought Liberty up to the Gray Equinox. Liberty sniffed the outside of the car and alerted to the presence of narcotics through a trained signaling behavior. Officer DiRienzo notified Zayas of this. Zayas then told DiRienzo, in sum and substance, that the car was his, no one else used it, and no one else was in it that day. Officer DiRienzo used a scope camera to look inside the cabin of the Gray Equinox. Using the camera, under the dashboard, in what appeared to be a secret compartment (the "Trap"), Officer DiRienzo saw a large amount of cash and what appeared to be narcotics. Officer DiRienzo then arrested Zayas. The Gray Equinox was towed back to WCPD Headquarters. There, law enforcement officers searched the Gray Equinox, and in the Trap, found the following: approximately 112 grams of crack cocaine, approximately $34,000 in cash; a black Smith & Wesson 9mm semiautomatic pistol containing 10 rounds of ammunition, and a black Taurus 9mm semiautomatic pistol containing 8 rounds of ammunition; two additional ammunition magazines, including a magazine hidden in a sock, and an extended 30-round ammunition magazine, containing ammunition.

Officers also seized two cellphones in connection with the arrest, one of which was on the dashboard of the Gray Equinox ("Subject Device-1") and the other was on Zayas's person ("Subject Device-2," and together with Subject Device-1, the "Subject Devices"). On or about

March 11, 2022 at approximately 10:53 a.m.,[3] the Hon. Andrew E. Krause, United States Magistrate Judge for the Southern District of New York, issued a warrant for the search of the Subject Devices (the "Subject Devices Warrant"). Among the ESI recovered from Subject Device-2 was a chat message dated March 10, 2022 at 2:44 p.m., sent by Subject Device-2, reading, "23 minutes."

### C. Procedural History

On March 11, 2022, the defendant was charged by complaint with possession with intent to distribute narcotics, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), and possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i). On March 22, 2022, a grand jury indicted him on the same charges. On August 15, 2022, Zayas moved to suppress evidence from the car stop, including cellphone evidence and the recovered drugs, cash, firearms and ammunition. (ECF Nos. 15-16, "Def. Mot.")

### **ARGUMENT**

In his motion, Zayas argues that the WCPD lacked reasonable suspicion to stop his vehicle, asserting that he was in complete compliance with all traffic laws before he was stopped. He denies that he changed lanes without signaling or drove even one mile-per-hour above the speed limit. This argument should be rejected on two grounds. First, the WCPD's pre-stop

---

[3] The PDF of the warrant submitted by the defense with its motion did not contain the timestamp. The Government has provided a copy of the timestamped version to the defense, along with timestamped versions of the photos of Subject Device-1 mentioned in the defendant's motion. Def. Ex. D; Def. Mot. at 17 n. 6. While the warrant was issued at 10:53 a.m., Special Agent Flanagan completed swearing out the warrant with Judge Krause telephonically before 10:40 a.m., the time the earliest of these photos was taken. Even if photos were taken of material on Subject Device-1 in the minutes before the warrant issued, such photos played no part in the warrant affidavit and would have been inevitably discovered if agents had waited until 10:53 a.m. *See United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006).

investigation provided reasonable suspicion that Zayas was involved in narcotics trafficking, even before he committed a traffic offense. The facts about this investigation are not in dispute and this Court should thus reject his claim on the papers. Second, should the Court believe that an evidentiary hearing is necessary, Officer DiRienzo will credibly testify that he saw the defendant travel over the speed limit and fail to signal as he changed lanes, which provided an independent basis for the stop.

Zayas further argues that Officer DiRienzo impermissibly prolonged the traffic stop by questioning Zayas and conducting a K-9 sniff. However, Officer DiRienzo's questioning quickly revealed Zayas's thin knowledge of his cover story and other indicia of deception. This, combined with the information WCPD had gathered on the Gray Equinox before the stop, satisfied the reasonable suspicion standard necessary to extend the stop to investigate narcotics trafficking, and the K-9 sniff ultimately provided probable cause for the search of the car.

Zayas also claims that the Subject Devices Warrant was overbroad and should be suppressed because of an alleged search before the warrant issued. These claims likewise should be rejected. Even if a WCPD officer had improperly examined Subject Device-1 before a warrant was obtained, the one fact that the defendant alleges came from a warrantless search – that the phone was set to navigate to an address in Washington Heights – was not essential to the probable cause determination made by the magistrate based on the DEA agent's affidavit. Because the Subject Devices Warrant contains independent grounds for probable cause beyond the address, this argument is unavailing. And even if the warrant were defective, the good faith exception would apply.

Finally, Zayas is not entitled to a hearing on the issue on of the reliability of the K-9 unit that alerted to the presence of narcotics in Zayas's car, as Zayas has not identified any factual

dispute as to the reliability of the dog, which was certified for narcotics detection by a bona fide organization. Accordingly, Zayas's motion should be denied without a hearing.

## I. OFFICER DIRIENZO HAD REASONABLE SUSPICION FOR THE STOP

### A. Applicable Law

An officer may initiate a brief investigative stop of a vehicle when he or she has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981); *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397 (2014); *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The test is "rather lenient," *United States v. Santana*, 485 F.2d 365, 368 (2d Cir. 1973), and "not a difficult one to satisfy," *United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977). Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). Courts "cannot reasonably demand scientific certainty ... where none exists." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Rather, they must allow officers to make "commonsense judgments and inferences about human behavior." *Id.* Reasonable suspicion is established where an officer is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).

Applying these principles, courts have consistently held that officers may stop a vehicle where there is reasonable suspicion that a traffic violation occurred. *See Whren v. United States*,

517 U.S. 806, 810 (1996) ("As a general matter the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009) ("We have held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment."); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.").

Under New York law, an unsafe lane change is a traffic offense, *see* N.Y. Veh. & Traf. Law § 1128, as is speeding, *id.* § 1180. These infractions subject violators to lawful detention or arrest. *See* N.Y. Veh. & Traf. Law § 155 ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); *Scopo*, 19 F.3d at 782 (2d Cir. 1994) ("When an officer observes a traffic offense— however minor—he has probable cause to stop the driver of the vehicle."). That is so even if the traffic offense is a mere pretext for making the stop. *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998) ("An officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance.").

## B. Discussion

### 1. WCPD Officers Had Reasonable Suspicion that Zayas Was Engaged in Narcotics Trafficking

As described above, the defendant's vehicle was identified as suspicious during a broader drug trafficking investigation by WCPD. This investigation examined data over a period of years and collected evidence regarding another individual and vehicle potentially connected to the same organization as the defendant, who, as described, drove a car containing with firearms, substantial quantities of crack and ammunition, and tens of thousands of dollars. In connection with the investigative work done by the WCPD, before the Gray Equinox was pulled over, the

head of the Intelligence Unit, Sergeant Kyle McCarrick, had collected "specific articulable facts" that, viewed collectively, "reasonably warrant[ed] suspicion." *Brignoni-Ponce*, 422 U.S. at 884. These facts included the following:

1. The defendant had a prior felony conviction for narcotics trafficking, and had additional prior arrests for narcotics and weapons offenses;

2. LPR data showed that, over the past years, the Gray Equinox, which was registered in Massachusetts, was used to make numerous short round trips to the New York City area, during at least some of which the car turned around in less than an hour;

3. Vehicle service data showed the car having more than twice the average annual mileage;

4. The day he was stopped by Officer DiRienzo, the Gray Equinox was traveling southbound on the Hutchinson River Parkway; the Equinox had traveled that route on several prior occasions, including on or about October 16, 2020, when it turned around and headed north in less than an hour;

5. Mid-size SUVs such as the Chevy Equinox are commonly used by drug traffickers for the installation of hidden compartments;

6. The defendant had sold his last car, also a mid-size SUV, to Individual-1, who had multiple prior convictions for narcotics offenses, and whose previous car had been taken by the police; and

7. Based on training and experience, narcotics traffickers often travel large distances to conduct a transaction and return quickly to their origin city.

In addition, Officer DiRienzo knew, based on his experience with WCPD, that parkways in Westchester County are a major corridor between New England and the New York City area for the trafficking of illegal narcotics, large amounts of U.S. currency from illegal narcotics sales

and weapons. Viewed together, these facts easily surpass "the low threshold of reasonable suspicion." *United States* v. *Rivera*, 353 F. App'x 535, 537 (2d Cir. 2009). *See also Sokolow*, 490 U.S. at 7 (officers had reasonable suspicion to search defendant who went on a short round-trip flight to Miami, paid cash for tickets, and traveled under a name that did not match the name on his telephone number).

The possibility that some of the facts known to law enforcement could be susceptible to innocent explanation does not "negate reasonable suspicion." *United States v. Santillan*, 902 F.3d 49, 57 n.2 (2d Cir. 2018). To the contrary, as the Supreme Court has explained, a "determination that reasonable suspicion exists … need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Indeed, a series of acts that are each "perhaps innocent in itself," may, taken together, "warrant further investigation." (*Id.*) (officer had reasonable suspicion to stop minivan that tripped sensors in remote area where driver appeared stiff while passing officer, children in van waived in abnormal manner, van followed path that avoided checkpoint, and van was registered in area known for smuggling). That is particularly so in the context of a suspected narcotics transaction. As the Second Circuit has explained, a reviewing court evaluates the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quoting *Oates*, 560 F.2d at 61). "In the case of a suspected drug transaction, … the reasonable suspicion inquiry must ask if 'the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer.'" *Id.* (quoting *United States v. Glover*, 957 F.2d 1004, 1009 (2d Cir. 1992)).

Here, experienced WCPD officers had substantial basis to believe that Zayas and his vehicle were connected to drug trafficking. In particular, officers knew, among other things, that the defendant was a convicted drug trafficker, who had gone on several short round trips in a car of a type commonly modified by drug dealers to contain hidden compartments, had driven the car an unusually high number of miles, was currently driving the car on a route it had traveled in the past to make a short roundtrip, and had transferred title of his last car to an individual who had also been convicted of narcotics trafficking felonies. "These facts, when viewed collectively by experienced police officers, created a reasonable suspicion that illegal narcotics activities were being conducted…." *United States v. Martinez-Gonzalez*, 686 F.2d 93, 99 (2d Cir. 1982).

Under the collective knowledge doctrine, it makes no difference that Sgt. McCarrick in the Intelligence Unit conducted the primary investigation of the defendant while Officer DiRienzo in the Conditions Unit stopped his vehicle. As the Supreme Court has explained, "where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983); *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986) ("[I]n light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates.").

In sum, given the totality of the circumstances, and viewed through the eyes of experienced officers, these facts provided "more than the requisite 'minimal level of objective justification'" required to stop the defendant's vehicle. *See United States v. Villegas*, 928 F.2d 512, 517 (2d Cir. 1991) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)); *United States v. Gomez*, 751 F. App'x 63, 66 (2d Cir. 2018) (officer had reasonable suspicion to stop vehicle that

was the subject of narcotics trafficking investigation even before he witnessed traffic infractions).

### 2. The WCPD Had Reasonable Suspicion that Zayas Had Committed a Traffic Offense

In addition to the defendant's connection to narcotics trafficking, Officer DiRienzo had a lawful basis to stop the defendant's vehicle because he personally observed the defendant commit a traffic offense, as set forth in the officer's incident report. To the extent this Court holds an evidentiary hearing, the Government anticipates that Officer DiRienzo would credibly testify that he observed the Gray Equinox change lanes without signaling and exceed the speed limit before he pulled it over. Ultimately, given the undisputed facts set forth above relating to the WCPD's extensive investigation of the defendant before the stop, it is not necessary for the Court to reach this issue. But should it wish to do so, the Government expects that Officer DiRienzo's testimony will match the contemporaneous written record and provide an independent basis for stopping the defendant's vehicle. *See Gomez*, 751 F. App'x at 66 (traffic infractions provided independent reasonable suspicion for stopping vehicle suspected of narcotics trafficking); *Dhinsa*, 171 F.3d at 724–25 ("An officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."). His testimony would be corroborated by – and Zayas's blanket assertion in his affidavit that he was "obeying all traffic rules and laws" strongly undermined by – the text message Zayas sent on March 10, 2022 at 2:44 p.m., while driving, in violation of N.Y. V.T.L. § 1225-d.

## II.  OFFICERS REASONABLY EXTENDED THE STOP TO INVESTIGATE NARCOTICS TRAFFICKING

The defendant also contends, in the alternative, that even if officers had reasonable suspicion to stop his vehicle, they impermissibly prolonged the stop to conduct a "full blown narcotics investigation."  (Def. Mot. 6-9.) This argument fails on the merits.

"A traffic stop may be extended for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015). When officers act to "confirm or dispel their suspicions quickly," *United States v. Sharpe*, 470 U.S. 675, 686 (1985), it cannot be said that the "detention [was] too long in duration to be justified as an investigative stop," *id.* (finding that a twenty-minute stop was justified); *see also United States v. Garrett*, No. 17-59, 2022 WL 2979588, at *2 (2d Cir. July 28, 2022) (summary order) (where officer took reasonable steps – including verifying driver's criminal background, asking the car's occupants follow-up questions, and awaiting another trooper's opinion – that were designed to confirm or dispel his suspicions, a delay of 35 minutes between the initial stop and calling the canine unit was reasonable); *Santillan*, 902 F.3d at 63 (2d Cir. 2018) (stop reasonably prolonged where officer had information necessary for a traffic citation within 8 minutes, asked for consent to search within 17 minutes, finished a preliminary search within 37 minutes, conducted a search with a drug-sniffing dog after 67 minutes, and arrested the defendants after 80 minutes); *Foreste*, 780 F.3d at 527 (finding stops of 22 minutes and 40 minutes reasonable).

The defendant's claim that it was wrong for law enforcement to conduct a narcotics investigation is predicated on the mistaken assumption that officers only had reasonable suspicion that he committed a traffic offense at the time he was stopped.  But as shown above, the investigative work by WCPD's Intelligence Unit gave law enforcement reasonable suspicion of

narcotics trafficking before the defendant was even pulled over. Given this independent basis for the stop, it was well within the officers' mission to investigate narcotics-related conduct. *See Gomez*, 751 F. App'x at 66 (officers did not improperly extend traffic stop where they had reasonable suspicion of narcotics trafficking before observing traffic infractions).

After officers stopped the defendant's vehicle, they uncovered additional evidence, which further raised their suspicions. Zayas laughed nervously, licked his lips, and seemed unsure about his destination, first agreeing that Lincoln Hospital was in the Yonkers, then saying it was in the Bronx. Both inconsistent responses and nervousness support a finding of reasonable suspicion. *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996) (finding reasonable suspicion where officers "noted the inconsistency in [the defendant's] statements as to his address and observed his apparent nervousness"). Zayas also avoided eye contact when answering, had a volume change when speaking about illegal items, and had shaking in his legs; taken together, the officer evaluated Zayas's behavior as indicative of deception. To the extent there is any question about the sufficiency of law enforcement's suspicion to investigate the defendant before pulling him over, the additional information the officer gained through the interview provided a proper basis to continue the investigation, even if that required extending the stop. *See Foreste*, 780 F.3d at 523 (traffic stop may be extended "if an officer develops a reasonable suspicion of criminal activity").

Finally, contrary to the defendant's suggestion, a canine's positive indication for narcotics is sufficient to establish probable cause for a search of a car. *See United States v. Bodnar*, 37 F. 4th 833, 840-41 (2d Cir. 2022) (citing *Harris*, 568 U.S. at 247). Once Liberty had sniffed the car and indicated the scent of narcotics, officers had probable cause to search the Gray Equinox.

### III. THE SUBJECT DEVICES WARRANT IS VALID

Zayas offers three main arguments for suppressing electronically stored information recovered from his cellphones: (1) the warrant did not adequately establish that evidence of a crime would be found on the phones, (2) the warrant was overbroad, and (3) the warrant relied upon a supposed unwarranted search of Zayas's phone. Zayas also requests a *Franks* hearing regarding the allegation that the Waze app showed the address to which the phone was navigating, and requests that the Government stop any search currently underway. Each of these arguments is meritless.

### A. The Warrant Is Factually Sufficient

The Subject Devices Warrant, which authorizes search and seizure of electronically stored information for evidence of the same Subject Offenses charged in the Complaint, was based on an affidavit of Homeland Security Investigations Special Agent Michael Flanagan (the "Subject Devices Warrant Affidavit," or "Flanagan Aff."). The Subject Devices Warrant Affidavit incorporates the Complaint and adds additional allegations. For instance, it notes the following, based on Special Agent Flanagan's communications with other officers involved in the investigation:

> a. Subject Device-1 was recovered on a magnetic dashboard mount in the front of the Gray Equinox. The screen was unlocked, and it displayed the app Waze, an application used for GPS navigation. The address to which the app was set to navigate was visible, and was located in the Washington Heights neighborhood of Manhattan, in New York City.

> b. The Subject Devices were in close proximity to the drugs shortly before the Subject Devices were seized.

(Flanagan Aff. ¶¶ 7(b) & (d).) Further, based on training and experience, Special Agent Flanagan understood the following:

a. The use of the navigation app on Subject Device-1, when a car with out-of-state plates was traveling to a location in New York carrying guns, cash, and money, indicates that Zayas was likely traveling to a location related to narcotics trafficking.

b. Where electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found on the devices months or even years after it occurred.

c. Narcotics dealers often keep records of their narcotics activity, including ledgers and bank statements, in digital form, whether on cellphones or other electronic devices.

d. Individuals involved in narcotics trafficking often use cellular phones to contact suppliers and purchasers of drugs, including through voice calls, text messages and electronic messaging applications launched from the phones. For instance, traffickers might use a phone to send messages describing the quantities of narcotics to be transacted, and make calls to arrange logistics such as the date, time and place of transactions. Individuals also may use cellphones for conducting financial transactions related to drug trafficking, e.g. paying for drugs or laundering proceeds of drug trafficking by transferring funds via payment app. Cellphones possessed by those involved in drug trafficking often contain photos and videos of illegal drugs, drug paraphernalia, cash, firearms, drug narcotics traffickers and premises where drugs are manufactured and sold.

e. Cellphones often contain geolocation information, which tracks the location of a phone while the feature is enabled, and allows law enforcement to determine the location of the cellphone at different historical times. Such information would be likely to show the route of Zayas on or about March 10, 2022, including the locations to and from which he travelled to conduct a drug transaction. Geolocation data could help locate sources of Zayas's supply, his customers, and his coconspirators.

f. Drug traffickers often use multiple phones for their narcotics activities, in order to conceal the existence or scope of their illegal business from others, including law enforcement.

(*Id.* ¶¶ 9-14.)

These facts are more than ample to support Judge Krause's finding of probable cause. "Probable cause is not a high bar." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018). It exists where "the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (emphasis added). Here, there was a fair probability that Zayas's multiple cellphones, which he took with him on a trip to transport drugs, guns and cash, would contain evidence of narcotics and weapons trafficking, including the locations to which Zayas traveled and the identities of his coconspirators.

### B. The Court Should Deny the Request for a *Franks* Hearing

The defendant requests a *Franks* hearing after challenging the statement in the warrant application that "the address to which the app was set to navigate was visible, and was located in the Washington Heights neighborhood." (Flanagan Aff., ¶ 7(b); compare Zayas Aff., ¶ 13.) Notably, Zayas does not contest that Subject Device-1 was present on the dashboard of the Equinox, where drugs, guns and money were found, or that the navigation app was in plain view, only that the Washington Heights address was visible without manipulation. This does not provide sufficient grounds for a hearing.

A defendant may challenge a search warrant when the supporting affidavit contains deliberately or recklessly false or misleading information. *Franks v. Delaware*, 438 U.S. 154, 164-72 (1978). A defendant is entitled to a hearing to determine whether a warrant affidavit "must be voided and the fruits of the search excluded" if the "defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly

false statement is necessary to the finding of probable cause." *Id*. at 155-56. In other words, even if a defendant makes a substantial preliminary showing of a deliberate or reckless omission, the defendant is not entitled to a *Franks* hearing if the false statement or omission was not "necessary to the [issuing] judge's probable cause finding." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (citation omitted). When the defendant alleges there were false statements in the affidavit, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Id*. (citation omitted). "The ultimate inquiry is whether, after putting aside erroneous information and correcting material omissions, there remains a residue of independent and lawful information sufficient to support a finding of probable cause." *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (alterations and quotations omitted).

Here, even if the challenged fact were omitted, there would be probable cause to issue the warrant. The critical facts are uncontested: crack cocaine, cash, firearms and ammunition were hidden in a secret compartment in Zayas's car; Zayas was driving from Massachusetts to New York City with the contraband; Zayas had a navigation app open on his phone and kept another phone on his person, with each phone no more than a few feet away from the secret compartment during the trip; cellphones often contain geolocation information, which tracks the location of a phone while the feature is enabled, and allows law enforcement to determine the location of the cellphone at different historical times, along with communications; and the affiant knew, based on training and experience, that narcotics traffickers often use cellphones to communicate with coconspirators, arrange transactions, and share photos of their illegal wares. The warrant would have been properly issued without mention of the address in Washington Heights, a relatively

minor point. The defendant does not allege any further reliance on a warrantless search of either Subject Device. Accordingly, the Court should deny the request for a *Franks* hearing.

### C. The Warrant Was Executed in Good Faith

Even if a search warrant were issued in violation of the Fourth Amendment, this "does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). Where the officers executing a warrant conducted a search "in good faith and in objectively reasonable reliance on the warrant," the evidence obtained in that search will not be suppressed. *United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987). In determining whether this "good-faith" exception to the exclusionary rule applies, a court must ask "the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon*, 468 U.S. 897, 922 n. 23 (1985). This evaluation is made in light of "all of the circumstances." *Herring*, 555 U.S. at 145. "[E]vidence seized pursuant to an overly broad search warrant will be suppressed only if the warrant was so facially invalid that the executing agents could not reasonably have relied on it." *United States v. Wapnick*, No. 92-CR-419 (CBA), 1993 WL 86480, at *7 (E.D.N.Y. Mar. 16, 1993), *aff'd*, 60 F.3d 948 (2d Cir. 1995). As discussed above, the Subject Devices Warrant was sufficiently particular that any reasonably well-trained officer would have believed it to be valid.

Zayas also suggests that the search warrant is invalid because it lacked a date limitation. (Def. Mot., 23-24.) While the failure of a warrant "to include a temporal limitation on the things to be seized may, in certain circumstances, render a warrant insufficiently particular, there is no consensus in this Circuit as to when one is required." *United States v. Farhat*, No. 18-CR-292 (JMA), 2022 WL 970780, at *2 (E.D.N.Y. Mar. 31, 2022) (cleaned up); *see also United States v.*

*Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002) ("A temporal limitation in a warrant is not an absolute necessity, but is only one indicia of particularity."). And while "an express time frame of 'within the last three years' or something of a similar nature may have been ideal, the lack of a time frame in itself does not transform what is otherwise a relatively particularized document into an unconstitutional general warrant." *United States v. Hernandez*, No. 09-CR-625, 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010).

Here, a date limitation was not required. The Subject Devices Warrant was sufficiently particularized, authorizing a search for evidence of narcotics and firearm offenses, and naming the particular types of materials to be seized (e.g., photographs, communications, geographic location, etc.) based on an affidavit whose allegations were concrete and specific. And even if the Subject Devices Warrant were invalid without a date limitation, the good faith exception would apply. "Because there is no consensus in this Circuit as to when temporal limitations are required – or when the lack thereof alone may invalidate an otherwise valid search warrant – the Court cannot here say that a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Nejad*, 436 F. Supp. 3d 707, 732-33 (S.D.N.Y. 2020); *see also United States v. Levy*, No. S5 11 CR. 62 PAC, 2013 WL 664712, at *11 (S.D.N.Y. Feb. 25, 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015) ("For overbreadth and particularity purposes, no controlling authority requires a specific time frame. In these circumstances, it cannot be said that executing officers should have realized a lack of date limitation constituted a facial deficiency in the Search Warrant such that reliance on it would be unreasonable.")

**D. The Search Was Timely**

The defendant also "moves to suppress any search [of the Subject Devices] that occurred after March 25, 2022 because according to the terms of the warrant, the search was to occur on or before March 25, 2022." (Def. Mot. at 24 n. 12.) This argument is baseless, and the ongoing search of the phones is proper.

Rule 41 of the Federal Rules of Criminal Procedure provides that a search warrant must be executed "within a specified time no longer than 14 days" from the date of its issuance. Fed. R. Crim. P. 41(e)(2)(A). However, Rule 41 is clear that, for warrants seeking electronically stored information, "[t]he time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the *seizure* or on-site copying of the media or information, and *not to any later off-site copying or review*." Fed. R. Crim. P. 41 (e)(2)(B) (emphasis added). The Advisory Committee notes explain that "the practical reality is that there is no basis for a 'one size fits all' presumptive period" for reviewing electronically-stored media, and that therefore, absent a separate judicially-imposed deadline, Rule 41 does not "impos[e] a deadline for the return of storage media."

The Subject Devices Warrant, issued on March 11, 2022, commanded the agents "to execute this warrant on or before March 25, 2022," two weeks from the date it was signed. Law enforcement seized the Subject Devices on March 10, 2022, the day of Zayas's arrest. Therefore, the seizure was compliant with Rule 41 and the timeline authorized by the warrant. *See United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 311-13 (S.D.N.Y. 2018) (no violation where phone was locked and Government possessed phone for a matter of months). Further, Zayas's phones were protected by passcodes, which Zayas has not provided the Government, requiring a

months-long decryption process to access the phones.[4] *United States v. Ganias*, 755 F.3d 125, 136 (2d Cir. 2014) (noting that encryption difficulties "might justify an off-site review lasting for a significant period of time.").

## IV. NO HEARING IS REQUIRED

"A defendant seeking the suppression of evidence is not automatically entitled to an evidentiary hearing on his claim; rather, the defendant must first state sufficient facts which, if proven, would [require] the granting of the relief requested." *United States v. Patterson*, 2013 WL 592657, at *2 (S.D.N.Y. Feb. 14, 2013). To raise "a factual issue," the defendant "must submit admissible evidence which, if credited, would make out a prima facie case.... This in turn requires that the issue ordinarily be raised by an affidavit of a person with personal knowledge of the facts." *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998). Mere assertions in a brief do not suffice. *United States v. Mason*, 2007 WL 541653, at *2 (S.D.N.Y. Feb. 16, 2007). Where allegations "are general and conclusory, an evidentiary hearing is unnecessary." *United States v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007).

Here, the defendant's affidavit disputes just two material facts. First, the defendant claims that, contrary to Officer DiRienzo's description of events, he obeyed all traffic laws before he was pulled over. But the Court need not resolve this factual issue to reject the defendant's claim. For the reasons set forth above, the WCPD's background investigation, which the defendant has no basis to challenge, provided an independent basis for stopping his vehicle. While the defendant argues summarily in his brief that there is "nothing suspicious about driving to New

---

[4] Subject Device-1 was unlocked at the time it was seized. But the digital process used by agents to obtain a copy of ESI on a cellphone requires relocking the device and then decrypting it, which took months. The screenshots taken of the device were taken before the phone was re-locked. A search of the devices is ongoing.

York," and challenges the allegation that that his car had exhibited a pattern suggesting narcotics trafficking, Def. Mot. at 4, arguments made solely by defense counsel in motion papers "cannot by themselves create a factual issue." *United States v. Mottley*, 130 F. App'x 508, 510 (2d Cir. 2005); *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) ("bald assertion" that allegations are untrue, without any "specification of the factual basis," is insufficient to show a disputed issue of fact that would justify a hearing).

Second, the defendant argues that the Washington Heights address to which Subject Device-1 was navigating was not visible on the screen at the time Officer DiRienzo observed it, or at least not visible without manipulating the screen. The defendant does not suggest that this fact played any part in the decision to search the Gray Equinox, and, as set forth above, this fact was also not essential to the probable cause finding in the Subject Devices Warrant.

Nor is the defendant entitled to a hearing on the question of the reliability of Liberty's detection of the odor of narcotics coming from the defendant's car. It is true that, as with other disputes of material fact, a defendant "must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Florida v. Harris*, 568 U.S. 237, 247 (2013). However, as with any other request for a hearing, the defendant must first raise a disputed issue of material fact as to the dog's credibility. *See United States v. Ligon*, 861 F. App'x 612, 621 (6th Cir. 2021) ("Because [the defendant] did not contest that Ciga [the dog] was certified by a bona fide organization, the district court did not err by presuming that the canine's alert provided probable cause to search without holding an evidentiary hearing."); *United States v. Nunez*, 753 F. App'x 450, 451 (9th Cir. 2019) ("Because [the defendant] failed to identify a factual dispute as to the canine's

reliability in his moving papers, the district court did not abuse its discretion in denying him an evidentiary hearing on the reliability of the canine's alert.").

Here, the Government has produced Liberty's certification by the New York State Division of Criminal Justice Services, a bona fide organization, attesting that Liberty and Officer DiRienzo are certified as a detection team for cocaine, crack cocaine, methamphetamines, MDMA, and heroin. The defense has not raised any fact that would challenge this certification or Liberty's reliability. As a result, the Court is permitted to, and should, rely on Liberty's certification to find the canine reliable without a hearing. The Court should also deny the defendant's request to order the Government to produce records of the dog's field performance, as the Supreme Court has held that such production is not required. *Foreste*, 780 F.3d at 528 ("under *Harris,* field performance records are not required for the prosecution to establish probable cause."); *Harris*, 568 U.S. at 246-47 ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog ... a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.").

## CONCLUSION

For the foregoing reasons, the defendant's motion should be denied without a hearing.

Dated: September 13, 2022
      White Plains, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: /s/ Josiah Pertz
Josiah Pertz
Assistant United States Attorney
